## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 09 2019, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT-FATHER

Benjamin J. Church
Church Law Office
Monticello, Indiana

ATTORNEY FOR APPELLANT-MOTHER

Mark A. Delgado
Monticello, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of P.L. (Minor Child); | January 9, 2019 |
| | Court of Appeals Case No. 18A-JT-1443 |
| L.P. (Father) and K.L. (Mother), | |
| *Appellants-Respondents,* | Appeal from the White Circuit Court |
| v. | The Honorable Robert W. Thacker, Judge |
| Indiana Department of Child | Trial Court Cause No. 91C01-1710-JT-17 |



Services,

*Appellee-Petitioner.*

**Najam, Judge.**

# Statement of the Case

L.P. ("Father") and K.L. ("Mother") (collectively, "Parents") appeal the trial court's termination of their parental rights over their minor child, P.L. ("Child"). Parents each present a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of their parental rights.

We affirm in part, reverse in part, and remand for further proceedings.

# Facts and Procedural History

Mother and Father were in a relationship and lived together between 2012 and early 2015. On November 23, 2015, Mother gave birth to Child.[1] In March 2016, the Indiana Department of Child Services ("DCS") received a report that

---

[1] At the time Mother gave birth to Child, Father did not know that Mother had been pregnant or that he was the father of Child. A paternity action was filed in June 2016, and the court found Father to be Child's father on September 30, 2016.

Mother was neglecting Child and that Mother was leaving Child in the care of Child's maternal grandfather, whom Mother knew had abused Child. After Mother tested positive for marijuana at multiple drug screens, DCS removed Child from Mother's care on March 3 and, thereafter, filed a petition alleging that Child was a child in need of services ("CHINS").[2] At that time, Father was incarcerated. On May 19, the trial court found Child to be a CHINS and ordered Parents to participate in services. After a few setbacks, Mother completed a substance abuse assessment, intensive outpatient treatment, and relapse prevention.[3]

[4] Father was released from incarceration in March 2016. However, he was again incarcerated in September 2016 with a scheduled release date of August 14, 2018. During the six months that Father was not in custody, he did not participate in services, he only attended one of three scheduled visits with Child, and he did not express an interest in learning to care for Child. Because of Father's incarceration in September 2016, and because DCS had concerns about Mother's judgment and ability to properly care for Child, on October 18, 2017, DCS filed a petition to terminate Mother's and Father's parental rights over Child.

---

[2] No party filed a copy of the original CHINS petition in the record on appeal.

[3] Mother had to restart relapse prevention twice after she had failed to attend classes, and she had to restart intensive outpatient treatment once after she had failed a drug screen.

Following a hearing, the trial court granted the petition on June 6, 2018. In support of its order, the trial court entered the following findings of fact:

**A. FACTS RELATING TO INITIAL REMOVAL OF CHILD, CHINS ADJUDICATION & DISPOSITIONAL ORDER.**

* * *

4. On March 2, 2016, White County DCS received a report alleging abuse or neglect by Mother against the child.

5. The report included allegations that Mother left the child in the care of maternal grandfather, [R.L.], whom she was aware had a history of committing physical and sexual abuse, as he had previously abused [M]other. The report further alleged that Mother continued to leave the child in the care of maternal grandfather after she was aware that he had physically abused the child including hitting [C]hild on the buttocks and witnessing him hit the child in the face.

6. The report further alleged that Mother and possibly maternal grandfather were using marijuana.

7. DCS investigated and substantiated the allegations.

8. DCS removed the child on an emergency basis on March 3, 2016.

* * *

11. Father is currently on work release.

* * *

**B. FACTS RELATING TO CONTINUED REMOVAL AND REASONABLE PROBABILITY REASONS FOR REMOVAL NOT REMEDIED.**

1. Mother has a substantial history with DCS, leading to the termination of her parental rights as to a previous child.

2. Mother has a history of non-participation. In December of 2015[,] Mother was referred for weekly in-home parenting services to Healthy Families, however only allowed one in-home visit.

3. Mother missed many visits with this child. Visitation was cancelled December 7, 2017, December 11, 2017, December 12, 2017, December 14, 2017, [and] December 21, 2017[,] due to lack of communication from Mother. Mother missed February 12, 2018[,] when she did not open the door when the child arrived for visitation.

4. Mother fell asleep during at least 5 visitations, including times in which she fell asleep holding the child.

5. Mother is resistant to suggestions and attempts to improve her parenting practices, disregarding expert recommendations.

6. Mother does not follow safe feeding practices as recommended by Riley pediatrician including no water or grape juice for infants.

7. No significant progress has been made during the 26 months of DCS involvement in improving Mother's parenting practices and parenting style.

8. Mother's house is not clean and safe for a child. The child had four documented instances of bed bug bites after visiting Mother's house.

9. Mother does not engage in safe sleep practices although having been repeatedly coached in them. Mother allows the child to sleep on the foot of her bed.

\* \* \*

12. Mother has not been consistently engaged with services, not attending therapy from November 3, 2017[,] through January, 2018.

13. Mother does not adequately provide for [C]hild's medical needs. On November 23, 2017[,] Mother believed [C]hild had burned her fingers and needed to go to the emergency room but chose to ask the foster placement to take the child instead of taking the child herself during visitation. On November 21, 2017[,] [M]other observed that [C]hild's buttocks were red and bleeding but did not take the child to the doctor.

14. Father is currently on work release, to be released August 14, 2018.

15. Father is not currently paying child support for the child.

16. When not incarcerated, the Father had one visitation with the child and chose not to participate.

17. Father does not know the child and has not bonded with her.

18. Father has been incarcerated three prior times, in 2012, 2013, and 2015.

19. Father does not have the resources available to care for the child now or when he is released from work release/incarceration.

20. Michelle Thedans, the ongoing Wabash Valley Therapist for the Mother since December 14, 2015, testified that as a therapist she does not believe presently that [Mother] can function in a caregiving parental capacity. The therapist believes the Mother has generally made individual progress with the Mother's ability to care for herself and meet her own adult needs. However, such individual therapeutic progress by the Mother over the last two years, does not amount to the Mother having the skills to be a provider and caregiving parent to her child. The therapist testified that the Mother has her diagnosed depression under control through medication, but the Mother has a high degree of anxiety which is not controlled and is reflected in the Mother's inability to cope with the general and situational pressures of being [the] caregiving parent to her child.

21. The Guardian Ad Litem [("GAL")], Rebecca Trent, testified that the Mother does not have the capacity and insight to be a suitable caregiving parent for the child, for the following reasons: the Mother does not recognize and respond to situations with the child that need the immediate attention of the parent such as dangerous situations, illness, and injury; the Mother is functioning at a low level with regard to the child's needs with vague verbal responses to questions regarding the child's care; the Mother is not meeting the child's needs for learning interactions and will not be able to do so in the future, which results in the child's intellectual and physical development and growth being diminished or delayed; the Mother has only a superficial bond with the child; and while the Mother has made some individual personal therapeutic progress, such progress has not been able to

sufficiently develop and enhance the Mother's parenting skills and attentiveness. The Guardian Ad Litem testified that the Father does not have the capacity or insight to be a suitable caregiving parent for the child for the reason that the Father has no attachment to the child and has not actively participated with the child during the CHINS case, and the Father's individual future is uncertain and unstable due to incarceration and criminal history. The Guardian Ad Litem recommends the termination of parental rights as to each parent.

## C. TERMINATION IS IN THE CHILD'S BEST INTERESTS IN THAT:

1. Mother has not made significant progress towards alleviating the issues that caused the child to be removed from the home.

2. Mother has not participated fully in services.

3. Mother has not been willing or able to improve her parenting practices.

4. Mother remains unable to provide a safe home environment for the child.

5. Father is unable to provide a safe home environment for the child.

6. Termination of the parent-child relationship is now in the best interests of the child for the reason that the child's growth and development require[] a safe and stable home and reasonable parenting attention, which the child has not received from either parent and which the evidence establishes the child would not be expected to receive in the future from either parent.

> 7. The Department of Child Services has a satisfactory plan for the care and treatment of the child. The plan of adoption is in the best interest of the child . . . .

Mother's App. Vol. II at 27-32. Based on those findings, the trial court concluded that there was a reasonable probability that the reasons for Child's removal and continued placement outside the home would not be remedied and that termination of the parent-child relationships between Parents and Child is in Child's best interests. Accordingly, the trial court entered an order terminating the parental rights of Parents. This appeal ensued.

## Discussion and Decision

### *Standard of Review*

[6] We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be

terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[7] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2). If the State fails to prove any one of the statutory elements, then it is not entitled to a judgment terminating parental rights. *See id*. at 1261.

[8] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of*

*Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[9] Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[10] On appeal, Parents each contend that the State presented insufficient evidence to support the termination of their parental rights. Specifically, both Mother and Father contend that the trial court erred when it concluded that the conditions that resulted in Child's removal and continued placement outside

the home will not be remedied[4] and that termination was in Child's best interests.  We address each Parent's contention in turn.

## *Mother*

### Conditions that Resulted in Child's
### Removal will not be Remedied

Mother first contends that the trial court erred when it concluded that the conditions that resulted in Child's removal from the home and continued placement outside the home will not be remedied as to her.  In determining whether the evidence supports the trial court's conclusion that Mother is unlikely to remedy the reasons for Child's removal, we engage in a two-step analysis.  *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014).  "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied."  *Id.* (quotations and citations omitted).  In the second step, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions.  *Id.*  However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child."  *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted).  Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and

---

[4]  The trial court did not conclude that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.

alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[12] Mother does not challenge any of the trial court's findings in support of its conclusion that the conditions that resulted in Child's removal will not be remedied. Rather, Mother maintains that the State presented insufficient evidence to demonstrate that she was unable to remedy the reasons for DCS' involvement because she had participated in services, removed herself from the abusive environment with maternal grandfather and secured her own housing, and she was progressing in therapy. In essence, Mother contends that the trial court erred when it terminated her parental rights because she was "doing everything DCS asked of her." Mother's Br. at 11. But Mother's arguments on appeal are simply a request that we reweigh the evidence, which we cannot do. Instead, we must determine whether the evidence most favorable to the judgment supports the trial court's conclusions. *In re D.D.*, 804 N.E.2d at 265. We hold that it does.

[13] During the hearing on the petition to terminate Parents' parental rights, Family Case Manager ("FCM") Brooke Brown testified that she had concerns regarding Mother's ability to ensure Child has the appropriate amount of food. Indeed, FCM Brown testified that there were "numerous" times that Mother did not feed Child during visitation. Tr. Vol. 2 at 40. Hayley Bradford, a

visitor facilitator, testified that Mother "struggled remembering" when to feed Child and she would frequently not give Child enough food. *Id.* at 55.

[14] Further, Mother would not give Child medication even though two separate doctors advised Mother that Child needed the medicine. Bradford testified that Mother did not make it a priority to call Child's doctor even when Mother was concerned with Child's health. FCM Brown testified to an instance in which Mother believed that Child had a yeast infection, but Mother informed FCM Brown that she was going to wait until the following week to call the doctor. The evidence shows that, on one occasion, Child burned her finger, but Mother did not "take action" and take Child to the emergency room. Ex. Vol. 4 at 9. Rather, Mother wanted the foster parents to take Child. And, on another occasion, Mother noticed that Child's buttocks were red and bleeding, but Mother again did not take Child to the doctor.

[15] FCM Brown also testified that, even after twenty-five months of DCS involvement, she still had concerns about Mother's ability to maintain a safe home. She specifically testified that she had those concerns because it would take Mother weeks to fix problems in her household that could pose a risk to Child's health or safety, including one occasion in which it took Mother four weeks to contact an exterminator after it was discovered that her apartment was infested with bed bugs. Indeed, the evidence shows that, on four occasions, Child returned to her foster parents from Mother's home with "big red bites all over her" and that her hands were swollen due to an allergic reaction to bed bug bites. *Id.* at 6. GAL Trent similarly testified that Mother is unable to recognize

potential safety issues, and that Mother will notice a safety problem "only after someone has mentioned it to her numerous times[.]" Tr. Vol. 2 at 156. Even then, it still takes Mother a long period of time to address the problem.

[16] In sum, Child was initially removed from Mother's care and custody due to the fact that Mother had failed multiple drug screens and due to concerns regarding Mother's judgment. And DCS continued to place Child outside of Mother's home due to ongoing concerns regarding Mother's judgment and her ability to properly care for Child. Mother has a history of forgetting to feed Child, of disregarding medical advice, of failing to seek medical attention for Child when it was needed, and of being unable to recognize and address issues with her apartment. And, even after twenty-five months of DCS involvement, DCS's concerns regarding Mother's judgment and ability to care for Child are "constant and ongoing" and continued to the date of the termination hearing. Tr. Vol. 2 at 157. As such, we cannot say that the trial court clearly erred when it found that the conditions that led to Child's removal and continued placement outside of the home will not be remedied.

## Best Interests

[17] Mother next contends that the trial court erred when it found that termination of the parent-child relationship was in the best interests of Child. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and

supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*.

[18] Mother maintains that termination is not in Child's best interests because "Mother had completed substance abuse assessment, evaluation[,] and treatment[;] completed Intensive Outpatient Treatment and Relapse Prevention[;] and had not had any issues with substance abuse since completing the most recent Intensive Outpatient Program and Relapse Prevention." Mother's Br. at 13. Mother also contends that termination is not in Child's best interests because Mother has secured housing and is bonded to Child. But, again, Mother's contentions on this issue amount to a request that we reweigh the evidence, which we cannot do.

[19] As discussed above, the evidence demonstrates that Mother has a history of forgetting to feed Child or feeding Child too little. Mother also would not give Child medication, even after two doctors informed Mother that Child needed the medicine. Additionally, Mother has a history of neglecting to seek medical attention for Child when needed. Further, Mother does not recognize safety problems, and she only notices the problems when someone else points them out to her. And, even then, Mother takes a long time to address the problems. Because of Mother's "constant and ongoing" inability to recognize and address problems that could be a danger to Child, GAL Trent testified that she believed that Mother would likely be negligent if Child were to be in her constant care.

Tr. Vol. 2 at 157. Accordingly, GAL Trent testified that termination of the parent-child relationship between Mother and Child is in the best interests of Child. And FCM Brown also testified that termination is in Child's best interests because of concerns with Mother's stability and judgment.

[20] Based on the totality of the evidence, including Mother's historical and ongoing inability to provide a safe and stable home for Child, we cannot say that the trial court clearly erred when it found that termination of Mother's rights is in Child's best interests. We therefore affirm the trial court's order terminating Mother's parental rights.

### Father

[21] Father contends that the trial court erred when it found that the conditions that resulted in the removal of Child or Child's continued placement outside of the home will not be remedied as to him. Specifically, Father contends that the trial court erred when it made that finding because, as of the date of the hearing on the petition to terminate his parental rights, he only had four months left on work release and because he "had made significant strides to improve his life." Father's Br. at 14. Father further contends that the trial court disregarded "the positive steps [he] has made to better his own life." *Id*. at 13. In essence, Father asserts that the trial court only considered his past behavior but did not balance that past behavior with the improvements he has made to his life.

[22] Again, to determine whether the evidence supports the trial court's conclusion that Father is unlikely to remedy the reasons for Child's removal, we first

identify the conditions that led to Child's removal and then determine whether there is a reasonable probability that those conditions will not be remedied. *See In re E.M.*, 4 N.E.3d at 643. DCS originally removed Child from Mother's care and custody for two general reasons: concerns about possible drug use by Mother and concerns about Mother's judgment. After DCS had removed Child from Mother's home, DCS placed Child in foster care due to Father's incarceration. DCS continued Child placement outside of Father's care because Father did not initially engage in services and because Father was again incarcerated shortly after the CHINS proceedings began.

[23] We must agree with Father that, in terminating his parental rights, the trial court focused only on his past behavior and not on the undisputed improvements Father has made in his life. We acknowledge that Father has been incarcerated three times. Indeed, Father admits that he was first incarcerated in 2012 and then again in 2015. It is likewise undisputed that Father was released from imprisonment in March 2016 but was thereafter again incarcerated on September 28, 2016, and he remained incarcerated at the time of the hearing on the petition to terminate his parental rights.[5] It is further undisputed that, during the six months in 2016 when Father was not incarcerated, Father did not participate in services, he only attended one of three scheduled visits with Child, he struggled with alcohol, and he did not display any interest in learning how to care for Child.

---

[5] It is unclear from the record what offenses Father committed that led to his incarceration in 2012. However, Father was incarcerated in December 2015 "for a probation revocation." Father's Br. at 6.

[24] But the record also demonstrates that, after Father's incarceration in 2016, he took positive steps and made a clear effort to better himself as a person. At the time of the termination hearing, Father had completed six months of substance abuse treatment and only had four classes remaining in a program called "Thinking for a Change." Tr. Vol. 2 at 142. It is also not disputed that those were the only services available to Father while he was incarcerated.[6] Further, Father was on work release at the time of the termination hearing. Father was employed as a welder, and he "absolutely" anticipated that he would continue his employment after he completed his term on work release. *Id.* at 143.

[25] While Father did not yet have housing at the time of the termination hearing due to his placement on work-release, the State did not present any evidence to suggest that Father would be unable to obtain appropriate housing upon the completion of his work-release placement. Rather, the only evidence that the State presented at the termination hearing regarding Father's future housing prospects was FCM Brown's testimony that she was uncertain where Father would live. But that testimony does not demonstrate that Father will not be able to provide appropriate housing for Child. And Father testified that he had been saving money and that he could "go get a place right now." *Id.* at 149. And, while Father did not substantiate that claim, DCS did not present any evidence to support a contrary finding. *See J.E. v. Ind. Dep't of Child Servs. (In re*

---

[6] FCM Brown testified that the "limited" services available in White County include "services for substance abuse like the twelve[-]step program, and then . . . there's another one. I don't believe they offer fatherhood engagement in incarceration." Tr. Vol. 2 at 16.

*K.E.)*, 39 N.E.3d 641, 647 (Ind. 2015) (holding that the trial court's finding that Father did not have suitable housing was clearly erroneous when Father testified that he planned to live with his father upon his release from prison and when DCS did not present any evidence to support a contradictive finding.).

[26] We acknowledge that, during the six months Father was not incarcerated in 2016, Father did not engage in services, only attended one of three visits with Child, and did not express an interest in learning to care for Child. But that all occurred two years prior to the termination hearing. As of the date of the termination hearing, Father had been engaging in visitation with Child for over one year, without missing a visit. And those visits were going well. Karen Travis, a visitation supervisor, testified that Child reaches for Father to pick her up, and that Child and Father play together and talk to each other. The evidence demonstrates that Child "grin[s] when she sees Father" and that she "does not hesitate to reach for [Father's] hand." Ex. Vol. 5 at 59-60. Thus, while Father initially struggled with his responsibilities as a parent, the record shows that, since his incarceration, Father has maintained a consistent, positive relationship with Child.

[27] We acknowledge that Father's record is far from perfect. But a trial court must judge a parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d at 643. Here, the evidence demonstrates that, since his incarceration in 2016, Father has worked within his limitations both to better himself by participating in the services that were available to him and to get to know

Child. Accordingly, Father has done everything in his power to remedy the mistakes of his past.

[28] We recognize that the GAL is concerned that "[w]e have no idea what [Father's] future behavior is going to be" and that it would be four months from the date of the termination hearing "before [Father's] out before we can even see if he would be stable . . . enough to care for [Child] and be successful in doing that." Tr. Vol. 2 at 159. But as discussed above, since his incarceration in 2016, Father has completed substance abuse treatment, he has obtained and maintained stable employment, and he has consistently visited with Child. The GAL's testimony, while understandable, is ultimately speculation, which is insufficient to support the termination of parental rights. Moreover, in light of Father's undisputed successful engagement with the only opportunities that have been available to him, Father "deserves a genuine chance to prove that he can parent his child." *K.T. v. Ind. Dep't. of Child Servs. (In re O.G., II)*, 65 N.E.3d 1080, 1096 (Ind. Ct. App. 2016). While Father may not prove that he can successfully parent Child, "he has a constitutional right to try." *Id.*

[29] We note that Mother and Father are not married, and they do not live together. This is not a case where Mother and Father continue to live lives that are intertwined. And Father's constitutional right to parent his child are independent from Mother's. While we cannot say that the trial court clearly erred when it terminated Mother's parental rights, under these circumstances, we find that the evidence does not support the trial court's conclusion that Father will not remedy the circumstances that led to Child's removal from the

home and Child's continued placement outside of the home.[7] We therefore reverse the trial court's order terminating Father's parental rights, and we remand to the trial court for further proceedings.[8]

### *Conclusion*

[30]  In sum, the trial court did not err when it found that the conditions that led to the removal of Child from Mother's home will not be remedied and when it found that the termination of the parent-child relationship between Mother and Child is in the best interests of Child.  But we hold that the State presented insufficient evidence to prove that Father will not remedy the conditions that led to the removal of Child and the continued placement of Child outside the home.  Accordingly, we affirm the trial court's order terminating Mother's parental rights.  But we reverse the trial court's order terminating Father's parental rights, and we remand for further proceedings.

[31]  Affirmed in part, reversed in part, and remanded.

---

[7] Because the State has failed to prove one of the requirements of Indiana Code Section 31-35-2-4(b)(2), we need not address Father's contention that the trial court erred when it found that termination of the parent-child relationship between Father and Child is in the best interest of Child.  *See In re G.Y.*, 904 N.E.2d at 1261 ("if the State fails to prove any of these four statutory elements, then it is not entitled to a judgment terminating parental rights.").

[8] In his brief on appeal, Father contends that the trial court's findings that he has not bonded with Child, that he does not have the resources available to care for Child, that he does not have the capacity and insight to be a parent because he has no attachment to the Child and has not participated with Child during the CHINS case, and that his future is unstable and uncertain due to his criminal history are not supported by the evidence.  But, even if we were to agree with DCS that those findings are supported by the evidence, those findings do not support the trial court's conclusion that Father will not remedy the reasons for Child's removal.  Accordingly, we need not address Father's contention regarding those findings of fact.

Pyle, J., and Altice, J., concur.